



**Daniel M. Silver**
Wilmington Office Managing Partner

T. 302-984-6331
F. 302-691-1260

dsilver@mccarter.com

McCarter & English, LLP

Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801-3717

www.mccarter.com

May 14, 2025

REDACTED PUBLIC VERSION
FILED MAY 28, 2025

**VIA CM/ECF**

The Honorable Christopher J. Burke
J. Caleb Boggs Federal Building
844 N. King Street, Unit 28, Room 2325
Wilmington, DE 19801-3555

Re: *Eagle Pharm., Inc. v. Apotex, Inc. et al.*, C.A. No. 24-64-JLH;
*Eagle Pharm., Inc. v. Slayback Pharma LLC*, C.A. No. 24-65-JLH;
*Eagle Pharm., Inc. v. Baxter Healthcare Corporation*, C.A. No. 24-66-JLH;

Dear Judge Burke:

Pursuant to the Court's orders on April 28, 2025 (C.A. No. 24-64, D.I. 127; C.A. No. 24-65, D.I. 106; C.A. No. 24-66, D.I. 101), Plaintiff Eagle Pharmaceuticals, Inc. ("Eagle") responds to and respectfully requests that the Court deny the three discovery issues raised by Defendants Apotex Inc. and Apotex Corp. (collectively, "Apotex"), Slayback Pharma LLC ("Slayback"), and Baxter Healthcare Corporation ("Baxter") (collectively, "Defendants").

### I. Defendants' Request For Additional Documents Regarding Eagle's Use Of Sodium Hydroxide Is Unwarranted

The Court should deny Defendants' request that Eagle produce additional documents responsive to RFP No. 39, which seeks "[a]ll documents that refer or relate to sodium hydroxide in Belrapzo®, Bendeka®, or any other Bendamustine Product," for three reasons.

First, Defendants' argument that documents regarding the role of sodium hydroxide in *Eagle products* are pertinent to a "central" issue regarding infringement is wrong. The role of sodium hydroxide in Eagle's commercial product is irrelevant to infringement, which is measured by comparing the accused products to the patent *claims*—not Eagle's product. *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) ("Infringement . . . is determined by comparing an accused product not with . . . a commercialized embodiment of the patentee, but with the properly and previously construed claims in suit."); *Atl. Thermoplastics Co. v. Faytex Corp.*, 970 F.2d 834, 846 (Fed. Cir. 1992) ("This court has repeatedly emphasized that infringement analysis compares the accused product with the patent claims, not an embodiment of the claims.").[1]

Second, even if relevant, Defendants do not claim that Eagle has *not* produced documents sufficient to show the role of sodium hydroxide in Eagle's bendamustine products. Rather,

---

[1] Defendants assert in passing that such materials allegedly are pertinent to damages issues and commercial success (Ltr. at 1-2), but offer no rationale or explanation. In any event, it appears to be founded on their erroneous assumption that such materials are somehow relevant to infringement.

May 14, 2025
Page 2

Defendants insist that Eagle must perform *additional* searches to produce *additional* documents. This fishing expedition fails because Defendants have not articulated any category of sodium hydroxide documents for which Eagle has not already produced responsive documents. Even if the requested documents had some marginal relevance, to date, Eagle has produced nearly 3,000 documents that explain the "role of sodium hydroxide" in Eagle's products, which is plainly more than sufficient.[2]  Ex. 1.  These produced documents address each of the categories Defendants raised in their March 28, 2025 letter, including: (1) "the decision to include sodium hydroxide," (Ex. 2 at -536-38; Ex. 3 at -655, -688; Ex. 4; Ex. 5; Ex. 6), (2) "how and when sodium hydroxide is used," (Ex. 2 at -540, -543; Ex. 7 at -447; Ex. 8 at -802-03; Ex. 9 at -163; Ex. 5; Ex. 6; Ex. 10), (3) "the amounts of sodium hydroxide included," (Ex. 10; Ex. 2 at -540, -543; Ex. 4; Ex. 5; Ex. 18; Ex. 6), (4) "any excipients considered as alternatives to sodium hydroxide," (Ex. 11 at -634; Ex. 12 at -501-02; Ex. 13; Ex. 14; Ex. 15 at -367; Ex. 4; Ex. 16), and (5) "any testing related to the inclusion of sodium hydroxide," (Ex. 16; Ex. 17; Ex. 14; Ex. 18; Ex. 5; Ex. 19 at -586; Ex. 4; Ex. 13), "in BELRAPZO®, BENDEKA®, or any other Bendamustine Product" (Ex. 20 at 1-2).

Defendants contend that Eagle must also search all "shared drives, lab notebooks, and custodial files and emails" of Drs. Sundaram, Romito, Wu, Sharma, and Grebow for the terms "sodium hydroxide" and "bendamustine." Ex. 20 at 2-4. That is illogical and unduly burdensome. Defendants do not articulate *any* deficiency in Eagle's substantial production, other than their incorrect claim that "for months Eagle has refused to even search for those documents." Ltr. at 2. Eagle has already searched for and produced *responsive* documents from 15 custodians: Scott L. Tariff, Phillip Christopher Buxton, Nagesh R. Palepu, Srikanth Sundaram, Steven Krill, Adrian Hepner, Foma Rashkovsky, Leonore Witchey, Linda Dell, Peter Grebow, Daniel O'Connor, Benjamin Levy, John Deighan, Reed McClung, and Julia Dattilo. Defendants are simply speculating, without proof, that additional non-cumulative documents exist, which is "insufficient to justify a further intrusion" into Eagle's records. *Heartland Rec'l Vehicles, LLC v. Forest River, Inc.*, No. 08-490, 2010 WL 3119487, at *5 (N.D. Ind. Aug. 5, 2010); *see also, e.g.*, *Robinson v. Horizon Blue Cross-Blue Shield of New Jersey*, No. 12-2981, 2013 WL 6858956, at *6 (D.N.J. Dec. 23, 2013) ("In addition to the cumulative nature of a number of plaintiff's discovery requests—and perhaps even more consequential—is this Court's view that plaintiff's reasons for seeking additional discovery are so speculative and/or irrelevant/remotely relevant to his claims that his requests stretch beyond the broad scope of discovery.").

Third, Defendants' requests for additional searches are not proportional to the needs of this case.  "It is axiomatic that a request for documents 'sufficient to show' does not require the production of all conceivably relevant information," and thus courts routinely deny motions to compel "all documents" where, as here, a party has already produced sufficient documents. *Reinsdorf v. Skechers U.S.A., Inc.*, 296 F.R.D. 604, 616 (C.D. Cal. 2013); *see, e.g.*, *Frontier Commc'ns Corp. v. Google Inc.*, No. 10-545, 2014 WL 12606321, at *7 (D. Del. Feb. 3, 2014) (holding that the interests of costs and proportionality favored denying request for all documents

---

[2] Defendants' claim that Eagle has not identified "a single" document responsive to RFP No. 39 is irrelevant because it is Defendants' obligation (and not Eagle's burden) to do so. *Greenbank v. Great Am. Assurance Co.*, No. 18-239, 2019 WL 6522885, at *3 (S.D. Ind. Dec. 4, 2019) ("A party moving to compel production carries the initial burden of establishing, with specificity, that the requested documents are relevant."). A search for the term "sodium hydroxide" or "NaOH" in Eagle's production yields nearly 3,000 documents. Defendants simply have refused to search.

related to a patent application where the party had produced responsive documents). "Discovery should not serve as a fishing expedition," and Eagle need not produce additional documents because it has already complied with its discovery obligations. *Robinson*, 2013 WL 6858956, at *6; *Edge Sys. LLC v. Ageless Serums LLC*, No. 20-9669, 2021 WL 4497505, at *8 (C.D. Cal. Aug. 20, 2021) ("[A] party's suspicion that [the] responding party failed to produce responsive documents does not justify compelled inspection."). Thus, Eagle respectfully requests the Court deny Defendants' request for additional searches for documents responsive to RFP No. 39.

## II. Eagle Need Not Produce Irrelevant And Cumulative Documents Underlying Eagle's 2025 Royalty Purchase Agreement

On March 31, 2025, Eagle announced that it had entered into a royalty purchase agreement with Blue Owl Capital (the "Agreement") for "$69 million before transaction costs as an upfront payment in exchange for a prespecified amount of Eagle's royalty interest for net sales of BENDEKA for the quarter ending December 31, 2024, and 100% of the royalty interest thereafter, up to an aggregate cap of up to 1.3 times the purchase price, depending on when the royalty cap is achieved, after which all future royalty payments from net sales of BENDEKA will revert back to Eagle." Ex. 25. On April 3, 2025, Defendants asked for all documents related to the Agreement, including all "draft agreements," "all presentations, summaries, and analyses compiled on behalf of (or otherwise provided to) Eagle by consultants, advisors or other independent parties related to the transaction," "communications between Eagle, Blue Owl Capital, and/or the unnamed 'party,'" and "all similar documents . . . exchanged between Eagle and any other potential purchasers for the royalty stream."[3] Ex. 21 at 1. Eagle offered to produce the executed deal documents and underlying financial modeling. Defendants rejected that offer and insisted on the categories of documents listed above. But each category is irrelevant and/or cumulative of documents Eagle already offered to produce.

First, "draft agreements" and documents "exchanged between Eagle" and other potential purchasers are irrelevant, particularly given that Eagle agreed to provide the actual deal documents *and* underlying repayment model. Ltr. at 3; *Eisai Inc. v. Sanofi-Aventis U.S., LLC*, No. 08-4168, 2011 WL 5416334, at *9 (D.N.J. Nov. 7, 2011) (denying motion to compel production of additional documents related to an acquisition as irrelevant, and unduly burdensome where the non-moving party agreed to provide information about the acquisition, including "the assignment of any contracts for the sale" of the company). Courts in this district have also held that draft documents are not relevant where, as here, the moving party can rely on the final versions. *See In re ML-Lee Acquisition Fund II, L.P.*, 151 F.R.D. 37, 41-42 (D. Del. 1993) (holding that defendants need not produce all drafts of final documents where the final versions would be relied on in making any relevant decisions, and noting that wholesale requests for all drafts would impose an "incredible burden" on the producing party).

Second, "communications" between deal parties and presentations about the deal are also irrelevant and/or cumulative of documents that Eagle agreed to produce, including the underlying financial modeling. This makes sense because information about advertising and shopping deals in pitch decks are irrelevant where, as here, the ***actual, final*** deal document is produced. Indeed,

---

[3] On April 30, 2025, Apotex also served subpoenas for cumulative documents related to the same transaction on third parties, including litigation counsel.

May 14, 2025<br>Page 4

this Court has denied motions to compel production of documents that are duplicative of documents that have already been or will be produced. *Frontier*, 2014 WL 12606321, at *7 ("[T]he Special Master finds this request unnecessarily duplicative in light of the fact that Google has produced or will produce documents concerning the design of the relevant technology."); *AbCellera Biologics Inc. v. Berkeley Lights, Inc.*, No. 20-8624, 2021 WL 3346412, at *1 (N.D. Cal. Aug. 2, 2021) ("Absent further explanation regarding the need for discovery of interim drafts, the Court will not require [the party] to produce such drafts."); *Craigville Tel. Co. v. T-Mobile USA, Inc.*, No. 19-7190, 2022 WL 1499908, at *3 (N.D. Ill. May 12, 2022) (denying motion to compel production of additional documents responsive to request seeking "***all*** responses to requests for proposals, presentations, or other documents ***reflecting representations*** Inteliquent made" in a bid to become exclusive provider because the request was overbroad and lacked relevance, "even though it may ultimately lead to the production of some relevant documents").

Moreover, communications and drafts are not relevant to the lone basis for Defendants' request, which is damages. Ltr. at 2-3. Damages are determined not by projections, but by actual sales. The damage to Eagle associated with obtaining such financing is axiomatically governed by the final agreement, not drafts thereof. To the extent projections are relevant at all, Eagle has already offered to produce its underlying financial modeling for the Agreement, which would be the best evidence of such projections. The lone case Defendants cite is for "litigation funding agreement documents," which is not applicable here, as Eagle simply entered this Agreement to repay a prior loan. Ex. 25 ("[Eagle] plans to use the net proceeds . . . to repay in full its existing Third Amended and Restated Credit Agreement."). The Court should deny Defendants' overbroad and unduly burdensome request to compel production of all documents surrounding the Agreement.

### III. Defendants Should Not Examine Dr. Buxton On Duplicative Topics

Defendants noticed the deposition of Dr. Phillip Buxton, a named inventor of the patents-in-suit. On May 1, 2025, Eagle agreed to limit Dr. Buxton's deposition to seven hours over two days ***conditioned on*** Defendants' agreement not to subject him to duplicative examinations. Ex. 22. On May 6, 2025, Defendants rejected Eagle's proposal. As such, the proposal reverted back to Eagle's last formal offer of six hours over two days. Ex. 23.

Defendants should not be allowed to conduct duplicative examinations of Dr. Buxton for three reasons. First, Dr. Buxton is elderly. Second, Dr. Buxton is not a party to this case. As such, Defendants must "avoid imposing undue burden or expense" on Dr. Buxton." FED. R. CIV. P. 45(d)(1). Finally, Apotex and Slayback ***already deposed*** Dr. Buxton in 2019 in a related case involving related patents, and that deposition transcript and exhibits have been produced in this case. As such, Defendants should be barred from asking duplicative questions at this second deposition to minimize the burden to an elderly, third-party deponent, including questions amongst the three Defendants and from Dr. Buxton's 2019 deposition. While Defendants claim that Eagle's request is unreasonable, that is not the case. Ex. 24 at 2-3. Eagle appreciates that Defendants may seek testimony on issues unique to this action, but reasonably requests that, given Dr. Buxton's age, prior testimony, and status as a non-party to this case, the Court order Defendants to refrain from examining him on topics that are duplicative amongst themselves and Dr. Buxton's 2019 deposition. *See* FED. R. CIV. P. 30(d)(3)(B); *J M Smith Corp. v. Astrazeneca Pharms. L.P.,* No. 20-1076, 2020 WL 7867552, at *2 (D. Del. Nov. 13, 2020) (holding counsel should try to avoid subjecting the same witness to more than one deposition and shall avoid duplicative questioning).

May 14, 2025<br>
Page 5

Respectfully submitted,

/s/ *Daniel M. Silver*

Daniel M. Silver (#4758)

cc: Counsel of Record (via CM/ECF)